1  RACHELE R. BYRD (SBN 190634)
2  MARISA C. LIVESAY (SBN 223247)
   BRITTANY N. DEJONG (SBN 258766)
3  **WOLF HALDENSTEIN ADLER**
     **FREEMAN & HERZ LLP**
4  750 B Street, Suite 1820
   San Diego, CA 92101
5  Telephone: (619) 239-4599
   Facsimile: (619) 234-4599
6  byrd@whafh.com
   livesay@whafh.com
7  dejong@whafh.com

8  *Attorneys for Plaintiff*

9  [Additional Counsel on Signature Page]

10                **UNITED STATES DISTRICT COURT**
11                **NORTHERN DISTRICT OF CALIFORNIA**

12  SHIVA STEIN,                                    )  Case No.
                                                    )
13            Plaintiff,                            )
                                                    )
14       v.                                         )  **COMPLAINT FOR VIOLATIONS OF**
                                                    )  **SECTIONS 14(a) AND 20(a) OF THE**
15  ELLIE MAE, INC., SIGMUND                        )  **SECURITIES EXCHANGE ACT OF**
    ANDERMAN, JONATHAN H. CORR,                     )  **1934**
16  KAREN BLASING, CARL BUCCELLATO,                 )
    CRAIG DAVIS, A. BARR DOLAN,                     )  <u>DEMAND FOR JURY TRIAL</u>
17  ROBERT J. LEVIN, MARINA LEVINSON,               )
    JEB S. SPENCER, RAJAT TANEJA,                   )
18                                                  )
19            Defendants.                           )
                                                    )
20                                                  )
21                                                  )
22                                                  )

1    Plaintiff Shiva Stein ("Plaintiff"), by her attorneys, makes the following allegations

2 against Ellie Mae, Inc. ("Ellie Mae" or the "Company") and the members of the board of directors

3 of Ellie Mae (the "Board" or "Individual Defendants," along with Ellie Mae, collectively referred

4 to as the "Defendants"), for their violations of Sections 14(a) and 20(a) of the Securities

5 Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17

6 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger

7 (the "Proposed Transaction") between Ellie Mae and EM Eagle Purchaser, LLC, an affiliate of

8 Thoma Bravo LLC ("Thoma Bravo").  The allegations in this complaint are based on the personal

9 knowledge of Plaintiff as to herself and on information and belief (including the investigation of

10 counsel and review of publicly available information) as to all other matters stated herein.

11                                          **INTRODUCTION**

12    1.    This is an action brought by Plaintiff to enjoin the Proposed Transaction whereby

13 the Board has agreed to sell Ellie Mae to EM Eagle Merger Sub, Inc. (the "Merger Sub"), a

14 wholly owned subsidiary of EM Eagle Purchaser LLC (an affiliate of Thoma Bravo), for $99.00

15 in cash for each share of Ellie Mae stock owned (the "Merger Consideration").  The Proposed

16 Transaction is at an unfair price and on grossly unfair and inadequate terms. The total equity

17 value of the Proposed Transaction is approximately $3.7 billion.  The Board has unanimously

18 recommended to the Company's stockholders that they vote for the Proposed Transaction.

19    2.    To convince Ellie Mae stockholders to vote in favor of the Proposed Transaction,

20 on February 28, 2019, the Board authorized the filing of a materially incomplete and misleading

21 Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange

22 Commission ("SEC"). The Proxy violates Sections 14(a) and 20(a) of the Exchange Act by

23 noncompliance with Regulation G and SEC Rule 14a-9 (17 C.F.R. § 244.100 and 17 C.F.R.

24 240.14a-9, respectively).

25    3.    Defendants have failed to disclose certain material information necessary for Ellie

26 Mae stockholders to properly assess the fairness of the Proposed Transaction, thereby violating

27 SEC rules and regulations and rendering certain statements in the Proxy materially incomplete

28 and misleading.

1
2
3
4
5

4.     In particular, the Proxy contains materially incomplete and misleading information concerning the financial forecasts for the Company prepared and relied upon by the Board in recommending the Company's stockholders to vote in favor of the Proposed Transaction. The same forecasts were used by Ellie Mae's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in conducting its valuation analyses in support of its fairness opinions.

6
7
8

5.     The material information that has been omitted from the Proxy must be disclosed prior to the forthcoming stockholder vote in order to allow the stockholders to make an informed decision regarding the Proposed Transaction.

9
10
11
12
13
14
15
16

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violations of Regulation G and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, all material information discussed below is disclosed to Ellie Mae stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated without corrective disclosures, to recover damages resulting from the Defendants' violations of the Exchange Act.

17

**JURISDICTION AND VENUE**

18
19
20

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

21
22
23
24
25
26

8.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that does sufficient business in California or an individual who has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.  All of the Defendants conduct business and/or maintain offices in California.  The headquarters of Ellie Mae are located at 4420 Rosewood Drive, Suite 500, Pleasanton, CA 94588.

27
28

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Ellie Mae is headquartered in this District.

1

## PARTIES

2    10.    Plaintiff has owned the common stock of Ellie Mae since prior to the announcement

3  of the Proposed Transaction herein complained of, and continues to own this stock.

4    11.    Ellie Mae is a corporation duly organized and existing under the laws of the State of

5  Delaware and maintains its principal offices in Pleasanton, California.  Ellie Mae is, and at all

6  relevant times hereto was, listed and traded on the NYSE under the symbol "ELLI."  Ellie Mae is

7  a cloud-based platform provider for the mortgage industry.

8    12.    Defendant Sigmund Anderman has served as Ellie Mae's Executive Chairman since

9  February 2015 and is the founder of the Company and former CEO.

10    13.    Defendant Jonathan H. Coor has served as Chief Executive Officer of the Company

11  since February 2015 and as a director of the Company since 2015.

12    14.    Defendant Karen Blasing has served as a director of the Company since June 2015.

13    15.    Defendant Carl Buccellato has served as a director of the Company since December

14  1997.

15    16.    Defendant Craig Davis has served as a director of the Company since January 2004.

16    17.    Defendant A. Barr Dolan has served as a director of the Company since June 2005.

17    18.    Defendant Robert J. Levin has served as a director of the Company since June

18  2009.

19    19.    Defendant Marina Levinson has served as a director of the Company since August

20  2014.

21    20.    Defendant Jeb S. Spencer has served as a director of the Company since August

22  2011.

23    21.    Defendant Rajat Taneja has served as a director of the Company since June 2015.

24    22.    The Defendants referred to in paragraphs 12-21 are collectively referred to herein as

25  the "Individual Defendants" and/or the "Board."

26    ## SUBSTANTIVE ALLEGATIONS

27    *The Proposed Transaction*

28    23.    On February 12, 2019, Ellie Mae announced that it had entered into the Agreement

1   and Plan of Merger (the "Merger Agreement"), whereby Thoma Bravo would acquire Ellie Mae

2   with the use of affiliated companies, with the affiliates surviving the Proposed Transaction:

3

4       **PLEASANTON, Calif.--(BUSINESS WIRE)--Feb. 12, 2019**-- Ellie
   Mae® (NYSE:ELLI), the leading cloud-based platform provider for the mortgage

5   finance industry, announced that it has entered into a definitive agreement to be
   acquired by Thoma Bravo, LLC, a leading private equity investment firm, in an all-

6   cash transaction that values Ellie Mae at an aggregate equity value of
   approximately $3.7 billion.

7

8       Under the terms of the agreement, all Ellie Mae shareholders will receive $99.00 in
   cash per share. The price per share represents a 47 percent premium to the 30-day

9   average closing share price and 49 percent premium to the 60-day average closing

10   price as of February 1, 2019.

11       "Since the founding of Ellie Mae more than 20 years ago, our mission has been
   simple – to automate everything automatable for the residential mortgage industry,"

12   said Jonathan Corr, president and CEO of Ellie Mae. "As we enter this next phase
   of our digital mortgage journey, we are thrilled to provide immediate value to our

13   shareholders. With the investment and support from Thoma Bravo, we will remain

14   committed to our customers' success, innovation and growth of the Encompass
   Digital Lending Platform while maintaining our position as a best place to work."

15

16       "Ellie Mae delivers powerful and innovative mortgage technology solutions across
   every channel of the residential mortgage sector, enabling lenders to originate more

17   loans while reducing costs and driving efficiency, quality and compliance
   throughout the mortgage process," said Holden Spaht, a Managing Partner

18   at Thoma Bravo. "Ellie Mae is leading the digital transformation of the residential

19   mortgage industry and we look forward to building on the company's successes and
   to our partnership through this next chapter of growth."

20

21       Ellie Mae's Board of Directors unanimously approved the definitive agreement and
   recommended that stockholders vote their shares in favor of the transaction. Ellie

22   Mae's headquarters will remain in Pleasanton, California, with regional offices
   across the United States. Closing of the transaction is subject to approval by Ellie

23   Mae stockholders and regulatory authorities and the satisfaction of customary

24   closing conditions. The transaction is expected to close in the second or third
   quarter of 2019 and is not subject to a financial condition.

25

26       The agreement includes a 35 day "go-shop" period, which permits Ellie Mae's
   Board and advisors to actively initiate, solicit, encourage, and potentially enter

27   negotiations with parties that make alternative acquisition proposals. Ellie Mae will
   have the right to terminate the merger agreement to enter into a superior proposal

28   subject to the terms and conditions of the merger agreement. There can be no

1
2
3

assurance that this 35 day "go-shop" will result in a superior proposal, and Ellie Mae does not intend to disclose developments with respect to the solicitation process unless and until the Board makes a determination requiring further disclosure.

4
5
6
7

J.P. Morgan Securities LLC is serving as the exclusive financial advisor to Ellie Mae and Cooley LLP is serving as the legal advisor to Ellie Mae. Jefferies LLC served as financial advisor to Thoma Bravo and Kirkland & Ellis LLP served as legal advisor to Thoma Bravo. Financing for the transaction is being provided by Jefferies Finance LLC.

8

### *The Offer Price is Inadequate and Unfair*

9
10
11
12
13
14
15
16

24.     Under the terms of the Merger Agreement, Ellie Mae shareholders will receive $99.00 in cash for each share of Ellie Mae common stock owned.  The Merger Consideration agreed to in the Proposed Transaction is inadequate, and Defendants' claims that the transaction provides a great return for investors are false, in light of the Company's recent financial performance and prospects for future growth. For instance, the Company reported its Fourth Quarter and full year ended December 31, 2018, financial results on February 14, 2019, including revenues of $116.0 million up from $112.9 million from the same quarter the previous year. Full year revenue was $480.3 million vs. $417.0 million for 2017.

17

### *The Materially Misleading and Incomplete Solicitation Statement*

18
19
20
21
22
23
24
25

25.     On February 27, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

26

### *Financial Forecasts*

27
28

26.     The Proxy fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the

1   Board in recommending that the shareholders vote in favor of the Proposed Transaction. Proxy at

2   47-49. These financial forecasts were also relied upon by the Company's financial advisor, J.P.

3   Morgan, in rendering its fairness opinion.

4           27.     Specifically, the Proxy provides two sets of financial forecasts developed by Ellie

5   Mae's management, the Management Projections and the Five-Year Projections. Proxy at 48.

6           28.     With respect to the Management Projections, the Proxy discloses the values and

7   definitions of certain non-GAAP (Generally Accepted Accounting Principles) financial metrics:

8   (1) Adjusted EBITDA, and (2) Unlevered Free Cash Flow, but fails to provide: (i) the value of

9   certain line items used to calculate these non-GAAP measures, or (ii) a reconciliation to their

10  most comparable GAAP measures, in direct violation of Regulation G and consequently Section

11  14(a). *Id.*

12          29.     With respect to the Five-Year Projections, the Proxy discloses the values and

13  definitions of certain non-GAAP (Generally Accepted Accounting Principles) financial metrics:

14  (1) Adjusted EBITDA; and (2) Free Cash Flow, but fails to provide: (i) the value of certain line

15  items used to calculate these non-GAAP measures, or (ii) a reconciliation to their most

16  comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

17  *Id.*

18          30.     Although the Proxy defines each of the aforementioned non-GAAP financial

19  measures and discloses the line items used in each measures' calculation in accompanying

20  footnotes, the Proxy fails to provide the values of these line items, and fails to reconcile each

21  measure to its most comparable GAAP equivalent.

22          31.     When a company discloses non-GAAP financial measures in a registration

23  statement that were relied on by a board of directors to recommend that shareholders exercise

24  their corporate suffrage rights in a particular manner, the company must, pursuant to SEC

25  regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP

26  measures not misleading, and must provide a reconciliation (by schedule or other clearly

27  understandable method) of the differences between the non-GAAP financial measure disclosed or

28  released with the most comparable financial measure or measures calculated and presented in

1  accordance with GAAP. 17 C.F.R. § 244.100.

2    32.    Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial

3  measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has

4  stated that the frequent use by publicly traded companies of unique company-specific non-GAAP

5  financial measures (as Ellie Mae included in the Proxy here), implicates the centerpiece of the

6  SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the
> GAAP information, has become the key message to investors, crowding out and
> effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief
> Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation
> Finance and I, along with other members of the staff, have spoken out frequently
> about our concerns to raise the awareness of boards, management and investors.
> And last month, the staff issued guidance addressing a number of troublesome
> practices *which can make non-GAAP disclosures misleading*: the lack of equal or
> greater prominence for GAAP measures; exclusion of normal, recurring cash
> operating expenses; individually tailored non-GAAP revenues; lack of consistency;
> cherrypicking; and the use of cash per share data.  I strongly urge companies to
> carefully consider this guidance and revisit their approach to non-GAAP
> disclosures.  I also urge again, as I did last December, that appropriate controls be
> considered and that audit committees carefully oversee their company's use of non-
> GAAP measures and disclosures.[1]

   33.    The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can

be inherently misleading, and has therefore heightened its scrutiny of the use of such forecasts.[2]

Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and

Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the

extremely narrow and limited circumstances, known as the business combination exemption,

---

[1]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (last visited Mar. 7, 2019). (emphasis added).

[2]    *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited Mar. 7, 2019); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited Mar. 7, 2019).

1    where Regulation G would not apply.[3]

2          34.    More importantly, the C&DI clarifies when the business combination exemption

3    does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for
> non-GAAP financial measures disclosed in communications subject to Securities
> Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended
> to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This
> exemption does not extend beyond such communications. Consequently, if the
> same non-GAAP financial measure that was included in a communication filed
> under one of those rules is also disclosed in a Securities Act registration
> statement, proxy statement, or tender offer statement, this exemption from
> Regulation G and Item 10(e) of Regulation S-K would not be available for that
> non-GAAP financial measure.

*Id.*

          35.    Thus, the C&DI makes clear that the so-called "business combination" exemption

from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the

extent that a third-party, such as a financial advisor, has utilized projected non-GAAP financial

measures to render a report or opinion to the Board.  To the extent the Board also examined and

relied on internal financial forecasts to recommend a transaction, Regulation G applies.

          36.    Because the Proxy explicitly discloses that the Board considered the forecasts of

future financial and operational results of the combined company, no exemption from Regulation

G is applicable. Proxy at 48.

          37.    At the very least, the Company must disclose the line item forecasts for the

financial metrics that were used to calculate the aforementioned non-GAAP measures. Such

forecasts are necessary to make the non-GAAP forecasts included in the Proxy not misleading.

Indeed, the Defendants acknowledge the misleading nature of non-GAAP financial measures, as

Ellie Mae stockholders are cautioned: "Non-GAAP financial measures should not be considered

in isolation from, or as a substitute for, financial information presented in compliance with

---

[3]    *Non-GAAP Financial Measures*, U.S. SECURITIES AND EXCHANGE COMMISSION (Apr. 4,
2018), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101 (last visited Mar.
7, 2019). To be sure, there are other situations where Regulation G would not apply but are not
applicable here.

GAAP, and non-GAAP financial measures as used by Ellie Mae may not be comparable to similarly titled amounts used by other companies." Proxy at 49.

38.     Thus, to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information on page 48, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

*Financial Analyses*

39.     With respect to the *Discounted Cash Flow* Analysis, the Proxy fails to disclose the Company's: (i) unlevered free cash flows; (ii) the line items used to calculate each company's unlevered free cash flows utilized by J.P. Morgan; (iii) the basis for Morgan Stanley's selection of the terminal growth rates ranging from 2.5% to 3.5%; (iv) the basis for the selected discount rates ranging from 9.0% to 10.0%, including the assumptions for calculating the Company's weighted average cost of capital; and (v) the Company's stock based compensation.

40.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Ellie Mae shareholders.

41.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## FIRST CAUSE OF ACTION
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

42.     Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth

1  herein.

2      43.      Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the

3  use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

4  national securities exchange or otherwise, in contravention of such rules and regulations as the

5  Commission may prescribe as necessary or appropriate in the public interest or for the protection

6  of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

7  authorization in respect of any security (other than an exempted security) registered pursuant to

8  section 78l of this title." 15 U.S.C. § 78n(a)(1).

9      44.      As set forth above, the Proxy omits information required by SEC Regulation G,

10  17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G among other

11  things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation

12  of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other

13  clearly understandable method" of the non-GAAP measure to the "most directly comparable"

14  GAAP measure. 17 C.F.R. § 244.100(a).

15      45.      The failure to reconcile the numerous non-GAAP financial measures included in

16  the Proxy violates Regulation G and constitutes a violation of Section 14(a).

17                          **SECOND CAUSE OF ACTION**
18      **(Against All Defendants for Violations of Section 14(a) of the Exchange Act**
          **and Rule 14a-9 Promulgated Thereunder)**

19      46.      Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth

20  herein.

21      47.      SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

22  statements that contain "any statement which, at the time and in the light of the circumstances

23  under which it is made, is false or misleading with respect to any material fact, or which omits to

24  state any material fact necessary in order to make the statements therein not false or misleading."

25  17 C.F.R. § 240.14a-9.

26      48.      Regulation G similarly prohibits the solicitation of shareholder votes by

27  "mak[ing] public a non-GAAP financial measure that, taken together with the information

28  accompanying that measure . . . contains an untrue statement of a material fact or omits to state a

1   material fact necessary in order to make the presentation of the non-GAAP financial measure . . .

2   not misleading." 17 C.F.R. § 244.100(b).

3        49.    Defendants have issued the Proxy with the intention of soliciting shareholder

4   support for the Proposed Transaction. Each of the Defendants reviewed and authorized the

5   dissemination of the Proxy, which fails to provide critical information regarding, amongst other

6   things, the financial forecasts for the Company.

7        50.    In so doing, Defendants made untrue statements of fact and/or omitted material

8   facts necessary to make the statements made not misleading. Each of the Individual Defendants,

9   by virtue of their roles as officers and/or directors, were aware of the omitted information but

10  failed to disclose such information, in violation of Section 14(a). The Individual Defendants were

11  therefore negligent, as they had reasonable grounds to believe material facts existed that were

12  misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such

13  information to shareholders although they could have done so without extraordinary effort.

14       51.    The Individual Defendants knew or were negligent in not knowing that the Proxy

15  is materially misleading and omits material facts that are necessary to render it not misleading.

16  The Individual Defendants undoubtedly reviewed and relied upon the omitted information

17  identified above in connection with their decision to approve and recommend the Proposed

18  Transaction.

19       52.    The Individual Defendants knew or were negligent in not knowing that the

20  material information identified above has been omitted from the Proxy, rendering the sections of

21  the Proxy identified above to be materially incomplete and misleading.

22       53.    The Individual Defendants were, at the very least, negligent in preparing and

23  reviewing the Proxy. The preparation of a registration statement by corporate insiders containing

24  materially false or misleading statements or omitting a material fact constitutes negligence. The

25  Individual Defendants were negligent in choosing to omit material information from the Proxy or

26  failing to notice the material omissions in the Proxy upon reviewing it, which they were required

27  to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately

28  involved in the process leading up to the signing of the Merger Agreement and the preparation of

1   the Company's financial forecasts.

2        54.    Ellie Mae is also deemed negligent as a result of the Individual Defendants'

3   negligence in preparing and reviewing the Proxy.

4        55.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who

5   will be deprived of her right to cast an informed vote if such misrepresentations and omissions are

6   not corrected prior to the vote on the Proposed Transaction.

7        56.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

8   equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

9   Defendants' actions threaten to inflict.

10                              **THIRD CAUSE OF ACTION**
                              **(Against The Individual Defendants for**
11                     **Violations of Section 20(a) of the Exchange Act)**

12       57.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

13  herein.

14       58.    The Individual Defendants acted as controlling persons of Ellie Mae within the

15  meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as

16  officers and/or directors of Ellie Mae, and participation in and/or awareness of the Company's

17  operations and/or intimate knowledge of the incomplete and misleading statements contained in

18  the Proxy filed with the SEC, they had the power to influence and control and did influence and

19  control, directly or indirectly, the decision making of the Company, including the content and

20  dissemination of the various statements that Plaintiff contends are materially incomplete and

21  misleading.

22       59.    Each of the Individual Defendants was provided with or had unlimited access to

23  copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

24  shortly after these statements were issued and had the ability to prevent the issuance of the

25  statements or cause the statements to be corrected.

26       60.    In particular, each of the Individual Defendants had direct and supervisory

27  involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

28  had the power to control or influence the particular transactions giving rise to the Exchange Act

1    violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous

2    recommendation of each of the Individual Defendants to approve the Proposed Transaction. They

3    were thus directly involved in preparing the Proxy.

4         61.    In addition, as the Proxy sets forth at length, and as described herein, the

5    Individual Defendants were involved in negotiating, reviewing, and approving the Merger

6    Agreement. The Proxy purports to describe the various issues and information that the Individual

7    Defendants reviewed and considered. The Individual Defendants participated in drafting and/or

8    gave their input on the content of those descriptions.

9         62.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

10   of the Exchange Act.

11        63.    As set forth above, the Individual Defendants had the ability to exercise control

12   over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

13   their acts and omissions as alleged herein. By virtue of their positions as controlling persons,

14   these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

15   proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

16        64.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

17   equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

18   Defendants' actions threaten to inflict.

19                              **RELIEF REQUESTED**

20        **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

21        A.    Preliminarily and permanently enjoining Defendants and their counsel, agents,

22   employees and all persons acting under, in concert with, or for them, from proceeding with,

23   consummating, or closing the Proposed Transaction, unless and until the Company discloses the

24   material information discussed above which has been omitted from the Proxy;

25        B.    In the event that the proposed transaction is consummated, rescinding it and

26   setting it aside, or awarding rescissory damages;

27        C.    Awarding compensatory damages against Defendants, individually and severally,

28   in an amount to be determined at trial, together with pre-judgment and post-judgment interest at

1  the maximum rate allowable by law, arising from the Proposed Transaction;

2          D.      Awarding Plaintiff the costs and disbursements of this action and reasonable

3  allowances for fees and expenses of Plaintiff's counsel and experts; and

4          E.      Granting Plaintiff such other and further relief as the Court may deem just and

5  proper.

6                          **DEMAND FOR JURY TRIAL**

7          Plaintiff hereby demands a trial by jury.

8   DATED: March 7, 2019                          **WOLF HALDENSTEIN ADLER**
                                                   **FREEMAN & HERZ LLP**
9

10                                                 By:   */s/ Rachele R. Byrd*
                                                   RACHELE R. BYRD
11                                                 MARISA C. LIVESAY
                                                   BRITTANY N. DEJONG
12                                                 750 B Street, Suite 1820
                                                   San Diego, CA 92101
13                                                 Telephone: (619) 239-4599
                                                   Facsimile: (619) 234-4599
14                                                 byrd@whafh.com
                                                   livesay@whafh.com
15                                                 dejong@whafh.com

16                                                 **Of Counsel**:

17
                                                   **WOLF HALDENSTEIN ADLER**
18                                                  **FREEMAN & HERZ LLP**
                                                   GLORIA KUI MELWANI
19                                                 270 Madison Avenue
                                                   New York, NY 10016
20                                                 Telephone: (212) 545-4600
                                                   Facsimile: (212) 686-0114
21

22                                                 *Counsel for Plaintiff*

23   803498

24

25

26

27

28